UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY MENOVCIK,

        Plaintiff,

v.

                                          Case No. 09-12096

BASF CORPORATION,                    Honorable Julian Abele Cook, Jr.

        Defendant.


ORDER

The Plaintiff in this civil litigation, Gregory Menovcik, has accused his former employer, BASF Corporation ("BASF"), of (1) unlawfully terminating him in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1140; (2) discharging him from its employment rolls because of age, in violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101, et seq.; (3) breaching a mutually agreed upon contract; (4) defaming him by mischaracterizing the reasons for his termination to third persons; and (5) subjecting him to an intentional infliction of emotional distress. On May 11, 2010, BASF filed a motion for summary judgment, which is now before the Court for a decision.

I.

The Plaintiff, Gregory Menovcik, is a California resident who was living and working in Michigan when his employment was terminated. The Defendant, BASF Corporation ("BASF"), is incorporated under the laws of the State of Delaware with authority to conduct its business in

Michigan.

Menovcik, a chemist with a masters degree in chemistry, had been an employee of BASF and its predecessor, Celanese, since 1979. In March 2009, Menovcik was the Technical Manager of the Product Development Group for OEM Coatings at the BASF's facility in Southfield, Michigan. He directly supervised seven chemists who, in turn, had approximately thirty other scientists and lab technicians reporting to them. Throughout the course of his employment at BASF, Menovcik consistently received promotions, pay raises, and strong performance reviews. He received an "outstanding" rating on his most recent performance review, which was received by him less than two weeks before his employment was terminated. In his latest evaluation, Menovcik's supervisor noted that he did a "great job mentoring and coaching" and that he "helped team dynamics." (Pl.'s Br. in Supp. of Resp. to Def.'s Mot. for Summ. J. 3.)

In early March 2009, Kristie Karr, the head of Human Resources at BASF's Southfield location, learned that an employee had filed, or was planning to file, a complaint against Menovcik who had allegedly been mistreating those employees whom he supervised. Thereafter, she initiated an investigation of the claims, after initially informing Menovcik's supervisor, Ken Perry, of the pending charge. Menovcik denied having mistreated any employees and asked Karr to expand upon the accusations and seek the identity of the accuser (or accusers). Karr initially declined, stating that it was against the policy of the Company to provide him with any specifics about the content or source of the allegations. However, she later acquiesced and gave Menovcik the name of one of the complaining parties during an "off the record" conversation.

Karr and Perry then jointly interviewed five of the employees whom Menovcik directly

supervised.[1]  Four of these employees reported that they had problems with Menovcik's behavior or had heard of other persons who were having issues with him.  Karr learned that a couple of the employees were fearful of Menovcik, who had reportedly threatened to retaliate against them if their complaints were voiced to the Human Resources department.  The fifth employee, whom Karr interviewed, denied having any problems with Menovcik's behavior or his management style. For reasons that are not evident,  Karr elected not to interview Menovcik,  his supervisor (Ken Perry), or any of the approximately thirty lab technicians with whom Menovcik worked in close proximity on a daily basis.

Following three days of investigation, and based on these limited interviews,  BASF elected to terminate Menovcik's employment on March 13th.  Prior to terminating him, Karr opted to forego some of the policy procedures that had been recommended by BASF regarding employee discipline.  For instance, she did not place him on an employee improvement plan or obtain the recommended approvals before termination.  During her investigation, Karr became aware of the numerous discrepancies in the claims against Menovcik, including an allegation by an employee who claimed that he had filed a formal complaint against him earlier in the month. However, this information was incorrect, in that no such formal complaint was filed against Menovcik.  (Pl.'s Br. 8-9.)  Furthermore, two of the employees (Pat Mormile and Paul Harris[2]) who (1) were interviewed during the investigation, (2) had made some negative comments about Menovcik, and (3) had just received poor performance reviews from him, admitted that some friction existed between them.

[1]One of the employees whom Menovcik directly supervised was out from the office on disability leave.  (Karr Dep. 14:15 - 15:4, Oct 6, 2009.)

[2] Harris acknowledged during  his deposition that he had a long-standing grudge against Menovcik.

(*Id.*)

After learning of his termination, Menovcik complained that he was escorted from the building by a security guard who "grabbed" his shirt as he was led out of the BASF facility. (Menovcik Dep. 44:11-14, Oct 5, 2009.) Shortly thereafter, Karr and Perry held a brief meeting with Menovcik's subordinates, and informed them that Menovcik had been let go for violations of the Company's Code of Conduct. According to Karr, the purpose of the meeting was to let the employees know that BASF takes their complaints seriously and to encourage employees to come forward to the Human Resources department if they have any other problems or issues with managers in the future.

Menovcik asserts in an affidavit that his termination occurred during a period of cost-cutting efforts by BASF:

> During the year preceding [his termination, he] was called upon to participate in a drastic campaign to cut costs in [his] department, including the product development unit. . . . The [C]ompany's actions in this regard were preliminary to the eventual closure of the Southfield facility at which [he] worked and relocation of product development functions to India, with its significantly lower wages and benefits.

(Pf.'s Resp. to Mot. for Summ. J., Ex. G, ¶ 2.) This averment appears to be confirmed in an undated memorandum by Juan Carlos Ordonez, who asserts that BASF "as a business continue[s] to be extremely challenged by [weaknesses in the economy and auto industry]." (Pf.'s Resp. to Mot. for Summ. J., Ex. K.) Moreover, Menovcik notes that BASF's OEM Coatings division in the United States, to which he belonged prior to his termination, saw a reduction in the workforce from 467 employees in January 1, 2008 to 348 employees in October 30, 2009, constituting a lessening in the Company work force of approximately twenty five percent.

Feeling aggrieved with his termination and the manner in which it was executed, Menovcik

commenced this lawsuit on May 31, 2009.

II.

Summary judgment is proper if no genuine issue of a material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for the entry of a summary judgment, the court must view the evidence and draw all reasonable inferences in the light that is most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden is on the movant to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Ultimately, when considering a motion for summary judgment, "the central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) *(*quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir.2005) (citation omitted). Significantly, the presentation of a mere scintilla of evidence to support a claim is insufficient and there must be evidence on which the jury could reasonably find for the plaintiff at trial. *Anderson*, 477 U.S. at 252. Indeed, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

III.

BASF first contends that Menovcik has no evidence to suggest it had any specific intent or ulterior motives that were related to his attainment of pension benefits when it terminated his employment. BASF further avers that the Company had legitimate business reasons for its actions. Menovcik, on the other hand, alleges that BASF concocted false grounds upon which to justify the

termination of his employment in whole or in part for the purpose of interfering with his attainment of pension benefits under the provisions of the Employment Retirement Income Security Act, 29 U.S.C. § 1140 (ERISA), in an attempt to avoid paying him a substantial amount in benefits.

Under § 510 of ERISA,, it is illegal for an employer to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *Strynkowski v. NGS Am., Inc.*, Case No. 07-15488, 2010 U.S. Dist. LEXIS 9613, at *7-8 (E.D. Mich. Feb. 3, 2010) (citing 29 U.S.C. § 1140; *Smith v. Ameritech*, 129 F.3d 857, 864 (6th Cir. 1997)). This provision is "aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980).

To state a claim under § 510, an employee  must demonstrate that the employer had a specific intent to violate ERISA through direct or circumstantial evidence. *Schweitzer v. Teamster Local 100*, 413 F.3d 533, 537 (6th Cir. 2005). Significantly, a plaintiff "need not show that the employer's sole purpose . . . was to interfere with [his] entitlement to benefits but rather only that it was a 'motivating factor' in the decision." *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir. 1996) (citing *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992)).

The Sixth Circuit Court of Appeals ("Sixth Circuit") defines direct evidence as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Schweitzer*, 413 F.3d at 533 (quoting *Jacklyn v. Schering-Plough Healthcare Prods., Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999)). Once the existence of credible direct evidence is determined, "the burden of persuasion shifts to the

defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination." *Jacklyn*, 176 F.3d at 926 (citations omitted). Moreover, "direct evidence of discrimination does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice . . . ." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003).

Menovcik contends that he has provided the Court with direct evidence to support his ERISA claim against BASF. He points to a memorandum by BASF which sets out the facts alleged by an anonymous caller over the Company's "Alertline." Specifically, this memorandum reports that "Menovcik threatens employees on the job when they do not tell him about their progress or the progress of the group." (Pl.'s Resp. to Mot. for Summ. J., Ex. J, p. 1.) On the second of two pages, this document also contains handwritten notes, allegedly written by a BASF officer who was involved in his termination. BASF states, in its answer to one of Menovcik's interrogatories (Question 15), that the people whom it was aware had contact with the memorandum were Roland DeLoach, Kristie Karr, Ken Perry and Juan Carlos Ordonez, all upper-level management personnel who were involved in the investigation. (Pl.'s Resp. to Mot. Summ. J., Ex. E at 11-12.)

There are two factors that, when combined, would have entitled Menovcik to a larger pension; to wit, his age and years of service. The handwritten notes on the memorandum set forth Menvocik's age (54) and years of service (27), with an arrow combining the two figures. However, as BASF argues, even assuming that this information is probative, it is not sufficient evidence to lead a reasonable fact finder to conclude, without drawing any inferences, that interference with his pension benefits was a motivating factor in the Company's decision to terminate Menovcik. The intent of the writer in making that calculation is unknown, thereby leaving the fact finder to

speculate about his or her motivation.

However, Menovcik maintains that there is a sufficiency of circumstantial evidence upon which to establish a prima facie ERISA case against BASF. In support of this argument, he highlights the temporal proximity between his actual discharge and his attainment of substantial pension benefits, BASF's ongoing cost-cutting program, and the manner in which the Company conducted its investigation.

In the absence of direct evidence of discriminatory intent, a plaintiff can avoid the entry of a summary judgment on a § 510 claim by establishing a prima facie case which reflects the existence of "prohibited employer conduct taken for the purpose of interfering with the attainment of any right to which the employee may become entitled." *Ameritech*, 129 F.3d at 865 (citation omitted). "[I]n making its prima facie case, a plaintiff must show a causal link between pension benefits and the adverse employment decision." *Walsh v. United Parcel Service*, 201 F.3d 718, 728 (6th Cir. 2000) (citation omitted).

Following the burden-shifting analysis in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973), an employer can refute an employee's prima facie ERISA case by advancing "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Ameritech*, 129 F.3d at 865. The burden then shifts back to the plaintiff to show that the reason provided was pretext, put forth to conceal an impermissible reason for termination. *Id.* "Summary judgment is appropriate if [the] plaintiff fails to establish a prima facie case or fails to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions." *Id.* (citation omitted).

While a plaintiff must show a causal link between attainment of pension rights and adverse employment actions, "[his] burden in establishing a prima facie case is not intended to be an

onerous one." *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113 (6th Cir. 2001) (citation omitted). Even a close temporal proximity between the attainment of ERISA benefits and the challenged employment action is enough to establish a prima facie case of discriminatory intent. *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043-44 (6th Cir. 1992) (evidence of temporal proximity sufficiently provided at least some inference of "intentional, prohibited activity"); *see also Pennington v. Western Atlas, Inc.*, 202 F.3d 902, 908 (6th Cir. 2000) (affirming reasoning in *Humphreys*).

At the time of his termination, Menovcik was a member of BASF's Salaried Employees' Pension Plan ("Plan"). As of the date of his dismissal, his right to receive some pension benefits under the Plan had already vested. However, when Menovcik was terminated, he was within three months of turning fifty-five, at which point his pension benefits under the Plan would have greatly increased. Additionally, if he remained with BASF until his fifty-sixth birthday (fifteen months from the date he was terminated), his age plus vesting years of service would have entitled him to take an early retirement without any reduction in Plan benefits.

In *Humphreys*, the court found that two months between the date of vesting and the date of termination was sufficient to establish the bare minimum for a prima facie case. *Humphreys*, 202 F.3d at 1043-44. In *Pennington*, the Sixth Circuit agreed that the plaintiffs had established a prima facie case based on a temporal proximity of up to six years. *Pennington*, 202 F.3d at 907. The proximity of Menovcik's fifty-fifth and fifty-sixth birthdays to his date of termination (three months and fifteen months, respectively) falls within the two month to six year range that the Sixth Circuit has found to be a sufficiently close temporal range to meet the prima facie threshold.

Menovcik has also proffered sufficient evidence to establish a causal link between his

termination and the pension benefits. Arguably, the fact finder might agree with Menovcik that the termination of an employee who was about to attain substantial pension benefits would be appealing against the backdrop of BASF's acknowledged cost-cutting program. Moreover, a jury could conclude that the Company's investigation into Menovcik's termination is rife with discrepancies and inconsistencies, including an unsubstantiated claim that he had called his supervisor at home to make threats against other employees, as well as an admittedly inaccurate statement that another complaint had been formally filed against him in the past. These discrepancies were not explored during Karr's three day investigation, raising a genuine question as to whether BASF had some other purpose when it terminated Menovcik's employment.

Menovcik had not contended that BASF's proffered nondiscriminatory reason for termination was pretextual until it addressed his age discrimination claim. He notes that the reasoning that was proffered by BASF in response to his age discrimination claim does not withstand scrutiny. Furthermore, Menovcik suggests that the same analysis should apply with respect to his ERISA claim. BASF provides the same nondiscriminatory reason for both claims; namely, that he violated the Company's Code of Conduct which, in its judgement, is a justifiable basis for its decision to terminate his tenure with the Company. Because the same justification is advanced by BASF for the ERISA and the age discrimination issues, the Court will apply the pretext analysis below to both claims.

BASF asserts that it conducted a "thorough" investigation into the complaints regarding Menovcik's conduct before terminating his services, and relies upon the results of its investigation to support its decision. While the complaints may have been the initial impetus of the investigation, Menovcik had no prior history of behavioral or performance issues with the Company, and there

exists significant evidence to suggest there were other motivating factors at work. BASF became aware of Menovcik's allegedly inappropriate behavior only days before he was dismissed. Menovcik was a very successful manager, consistently executing large projects for the Company. Given his long and blemish-free career with BASF, a fact finder jury could easily conclude that the three day investigation under the circumstances was hasty and incomplete. The fact that Menovcik's termination took place less than two hours after Karr's final interview with an employee speaks to the rushed nature of the investigation. (Harris Dep. 32:4-35:8 Oct 6, 2009).

The manner in which the investigation was conducted also provides reason for pause. For reasons that are not clear, Karr did not interview Menovcik or allow him to respond to any of the complaints against him. She also elected not to interview his direct supervisor, Ken Perry, or any of the thirty-plus other employees under his supervision. Although two of Menovcik's accusers had recently received poor performance reviews, one of whom apparently harbored an admitted personal grudge against him, neither Karr nor Perry conducted any further investigation into these employees' possible personal biases, raising doubt as to the quality of their investigation. There is also evidence that Karr did not follow many of the BASF policies relating to employee discipline, such as obtaining all of the recommended approvals for termination, or implementing a personal improvement plan for Menovcik.

Menovick has introduced sufficient evidence that, if believed by the fact finder, may suggest that BASF's investigation was not sufficiently thorough and that its proffered reason for termination was pretextual, creating a genuine issue of a material fact. Therefore, BASF is not entitled to summary judgment on the ERISA claim.

## IV.

Next, BASF contends that Menovcik has failed to present any evidence that his age was a motivating factor in his termination. In making this argument, it claims that he does not have any evidence that similarly situated younger employees were not discharged for engaging in similar misconduct. Menovcik alleges that, inasmuch as BASF's benefits are awarded on the basis of years of service and age, it also discriminated against him because of his age.

Menovcik brought his age discrimination claim under Michigan's Elliott-Larsen Civil Rights Act ("ECLRA"), Mich. Comp. Laws § 37.2101, *et seq.*, meaning that Michigan substantive law governs this action. However, "Michigan courts frequently look to federal law when reviewing claims of age discrimination under the Elliott-Larsen Act." *Scuderi v. Monumental Life Ins. Co.*, 344 F. Supp.2d 584, 592 (2004); s*ee Brocklehurst v. PPG Industries, Inc.*, 123 F.3d 890, 894 (6th Cir. 1997). Thus, it is appropriate for this Court to consider federal and state law when analyzing Menovcik's claim. *See Scuderi,* 344 F.Supp.2d at 592.

To prevail on an age discrimination claim under the ELCRA, a plaintiff must establish that age was a "determining factor" in the employer's adverse employment decision. *Town v. Michigan Bell Telephone Co.*, 568 N.W.2d 64, 69 (Mich. 1997). A plaintiff can establish an age discrimination claim under the ELCRA by presenting direct or circumstantial evidence of discrimination. *Id.* at 67.

The term, "direct evidence" is defined by the Sixth Circuit as that "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Sniecinski v. Blue Cross & Blue Shield*, 666 N.W.2d 186, 192 (Mich. 2003)

(citations omitted). "[W]here the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Id.* at 192 (citation omitted).

To support his claim that there is direct evidence of age discrimination, Menovcik cites *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). In *Hazen Paper*, the Supreme Court considered whether an employer violates the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), which is the federal parallel to ELCRA in Michigan by acting on the basis of a factor that is empirically correlated with age, such as an employee's pension status or seniority. *Id.* at 608. The Supreme Court concluded that a claim for disparate treatment under the ADEA could not be maintained if the sixty-two-year-old plaintiff was terminated a few weeks shy of attaining the ten years of *service* which he needed for his pension benefits to vest, noting that "an employee's age is analytically distinct from his years of service." *Id.* at 611. However, it should also be noted that the Supreme Court declined to consider "the special case where an employee is about to vest in pension benefits as a result of his *age*, rather than years of service." *Id.* at 613 (emphasis in original).

Although it appears that neither the Sixth Circuit nor the appellate courts in Michigan have addressed such a "special case," a district court within the Sixth Circuit, along with a number of other federal appellate courts, have done so. These courts have adopted the view that evidence of age discrimination exists if an employee whose pension benefits are about to vest as a result of his age is terminated. *See, e.g., Greene v. Safeway Stores*, 98 F.3d 554, 563 (10th Cir. 1996) (fifty two year old plaintiff who was discharged shortly before his benefits would have vested under pension

plan which conditioned vesting exclusively on employee's age could use this information as evidence of age discrimination); *Huff v. UARCO, Inc.*, 122 F.3d 374 (7th Cir. 1997) (employer who conditioned the form of receipt of early retirement funds on a combination of years of service and age had discriminated against its employees on basis of age); *Hunley v. A.O. Smith Corp.*, Case No. C-3-92-513, 1998 U.S. Dist. LEXIS 22897, at *15-16 (S.D. Ohio Aug. 6, 1998) ( if an employer fired an employee because he was about to reach the age where he would be able to take an early retirement it would "unquestionably violate[] the plain language of the [ADEA]").

BASF's pension plan is based on accumulated age and years of an employee's service with the Company. Because age is an express condition of receiving a benefit, it appears that this lawsuit presents a close approximation of the "special case" that *Hazen Paper* declined to decide. Thus, this Court will adopt the reasoning of the Tenth and Seventh Circuit Courts and the District Court for the Southern District of Ohio and, in so doing, find that Menovcik's pension benefits were about to vest (as a result of his age and years of service) when he was terminated may serve as evidence of age discrimination.

In *Greene*, the Tenth Circuit Court of Appeals found that the evidence of age discrimination under the *Hazen Paper* principle may serve as some evidence of discrimination, but that more evidence was required. *Greene*, 98 F.3d at 563. However, in *Huff*, the Seventh Circuit Court of Appeals appears to have found that the evidence proffered by the plaintiff under a *Hazen Paper* theory of recovery to be sufficient on its own to withstand summary judgment; namely, that he was terminated just before his benefits – which were based on age and years of service – were about to vest. *Huff*, 122 F.3d at 388. In any event, Menovcik contends that he can also make out a prima facie case of age discrimination in addition to the evidence provided under the *Hazen Paper*

formulation.

A plaintiff can prove discrimination by establishing a prima facie case, using the same burden-shifting framework in *McDonnell Douglas,* and applied to Menovcik's ERISA claim. A common articulation of the steps that are required to establish a prima facie case of age discrimination under this framework is set forth in *Town v. Michigan Bell Telephone Co.*, which requires that a plaintiff demonstrate that he was "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town*, 568 N.W.2d at 68.

Of course, "the facts necessarily will vary in [discrimination] cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to different factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13; *see, e.g., Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ( *McDonnell Douglas* method "was never intended to be rigid, mechanized, or ritualistic"); *see, e.g., Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 590 n.1 (6th Cir. 2003) ( "the Supreme Court [in *McDonnell Douglas*] did not intend its discussion to limit the ways in which a plaintiff could establish a prima facie case"). Despite the shifting burdens of production in a prima facie case, "[t]he plaintiff retains the ultimate burden of proving that 'age was the "but-for" cause of the employer's adverse action.'" *Harris v. Metro. Gov't of Nashville & Davidson County*, 594 F.3d 476, 485 (6th Cir. 2010) (citations omitted).

Michigan law imposes a higher burden than federal law on plaintiffs at the pretext stage. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 438 (6th Cir. 2002). In *Town,* the Michigan Supreme Court clarified the plaintiff's burden, noting that "[t]he plaintiff cannot simply show that

the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id*. at 72.

The parties agree that Menovcik is a member of a protected class who was subjected to an adverse employment action. However, they disagree over factors three and four of the prima facie case requirements. BASF contends that Menovcik does not satisfy the third requirement of the prima facie test because his allegedly abusive behavior toward employees rendered him unqualified for his job. However, there is significant evidence – which the fact finder could credit – to show not only that Menovcik was qualified, but that he was an excellent performer for the Company. In his nearly thirty year career with BASF, he never received a poor performance review, with his most recent review rating his performance as "outstanding" on many levels. Further, prior to March 2009, BASF had never received any formal complaints about Menovcik's management style or behavior. These facts give rise to a genuine issue of a material fact concerning Menovcik's qualification for the position, establishing the third factor of the analysis.

With respect to the fourth factor in the prima facie case, Menovcik uses the articulation of the standard in *Sniecinksi*, which states that a plaintiff may establish a prima facie case by showing that "[the adverse employment action] occurred under circumstances giving rise to an inference of unlawful discrimination." *Sniecinksi*, 666 N.W.2d at 193. BASF, on the other hand, relies on the more traditional formulation of the fourth prima facie factor for age discrimination claims, which requires a plaintiff to show that "he was replaced by a person outside the protected class." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). BASF then engages in an analysis whereby it determines that Menovcik was not replaced by a "significantly" younger person

and, in its judgment, he failed to make a prima facie case for age discrimination.

The Supreme Court and the Sixth Circuit have cautioned that the facts will always vary in discrimination cases, and the specification of the prima facie proof required may vary depending on the circumstances. *See McDonnell Douglas*, 411 U.S. at 802 n.13; *Brown*, 338 F.3d at 590. Given the interrelated nature of the ERISA and age discrimination claims by Menovcik, and the cost-related tinge of the discrimination here, the circumstances of this case seem to call for a broader reading of the prima facie requirement than that articulated in *Grosjean*. As such, the Court adopts the *Sniecinksi* formulation and, in so doing, considers whether the circumstances surrounding Menovcik's termination give rise to an inference of unlawful discrimination. The arguably hasty and incomplete nature of BASF's investigation, when combined with the on-going cost cutting program and reduction of staff in Menovcik's division are undeniably suspicious elements. Furthermore, BASF did not provide Menovcik with a meaningful opportunity to address the Company's concerns, to explain himself, or to place him on any projected improvement plan before deciding to terminate him as recommended in its own policies, all of which could appear suspicious to a fact finder given his completely clean employee slate prior to the alleged complaint. All of these facts, especially when viewed in a light that is most favorable to Menovcik, give rise to a significant inference of discrimination.

Having determined that Menovcik has established a prima facie case of age discrimination, the burden now shifts to BASF to provide a legitimate, nondiscriminatory reason for terminating his employment. BASF again turns to the results of its investigation, which it deems to be thorough.

Menovcik's age discrimination claim is generally repetitive of his interference with pension

benefits claim under ERISA. As stated above, there is significant evidence to suggest that BASF's proffered reason for termination with respect to the ERISA claim was pretextual (e.g., cost-cutting efforts of the Company, seemingly rushed investigation, inconsistencies, etc.). Therefore, the Court concludes that Menovcik's evidence of pretext with respect to his age discrimination claim is sufficient to overcome BASF's motion for summary judgment.

## V.

Menovcik rests his breach of contract claim on two BASF internal policy documents, namely, the Involuntary Termination Procedure for Management Represented Employees ("Termination Policy"), and the Severance Benefits Procedure for Management-Represented Employees ("Severance Policy"). It is not disputed that, as a manager, Menovcik was familiar with both of these procedural policies. For the sake of the summary judgment motion, BASF accepts that the internal policies are contracts, but contends that his claim must still be dismissed.

Not all policy statements rise to the level of a "promise," which the Michigan Supreme Court has recognized as a "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Lytle v. Malady,* 458 Mich. 153, 165 (1998) (citations omitted). Further, "[a] lack of specificity of policy terms or provisions, or a policy to act in a particular manner as long as the employer so chooses, is grounds to defeat any claim that a recognizable promise in fact has been made." *Id.* (citing *Rood,* 507 N.W.2d at 139 ). Significantly, "provisions in a handbook will not create enforceable rights when the handbook expressly states that such provisions are not intended to create an employment contract." *Lytle*, 458 Mich. at 169; *see also Heurtebise v Reliable Business Computers, Inc.*, 550 N.W.2d 243, 247 (Mich. 1996) (presence of explicit disclaimer in employee handbook

demonstrated that employer did not intend to be bound by provisions within the handbook).

With respect to employment contracts, "Michigan law presumes that employment relationships are terminable at the will of either party." *Horton v. 48th Dist. Court*, 446 F. Supp. 2d 756, 761 (E.D. Mich. 2006) (citation omitted). Nevertheless, "[a]n employee's legitimate expectations grounded in his or her employer's policy statements may create enforceable contract rights to be terminated only for just cause and in accordance with established termination procedures." *Langeland v. Bronson Methodist Hosp*., 444 N.W.2d 146, 148 (Mich. Ct. App. 1989) (citation omitted).

## A.

In his amended complaint, Menovcik claims that BASF failed to utilize several procedural safeguards that were articulated in its Termination Policy before his employment was involuntarily terminated. He contends that the Termination Policy constitutes a valid, binding contract between the parties, and that, by not following its written protocol, BASF violated its contractual obligations.

The Termination Policy states that its purpose is to "provide guidelines for the Involuntary Termination of Management Represented Employees to assure compliance with labor laws and fair employment practices," and provides an outline of what officers within the Company should be involved with terminations. Significantly, paragraph 4.7 of the Termination Policy contains a provision providing for management discretion in termination situations, stating:

> 4.7 Management Discretion
> BC management *reserves the right to disregard this procedure* and, acting in its sole discretion, impose disciplinary action which it deems appropriate up to, and including termination.

(Def.'s Mot. for Summ. J., Ex. 11 ¶ 4.7) (emphasis added).

19

Assuming that the Termination Policy constitutes a contract, the language in paragraph 4.7 of the Termination Policy functions as a specific disclaimer which reserves the Company's right to deviate from the procedure as outlined within the document. Those courts which interpret Michigan contract law have consistently found that disclaimer language in employee handbooks sufficiently evidences a company's intention not to be contractually bound by the provisions of its employee policies. *See Lytle*, 458 Mich. at 169; *see also Heurtebise*, 550 N.W.2d at 247. Menovcik does not discuss the Termination Policy disclaimer in his response to BASF's motion, addressing only the Severance Policy. Based upon the disclaimer language within the Termination Policy, as well as Menovcik's failure to provide any additional support for this claim in his response, the Court finds that his breach of contract claim which is predicated on the Termination Policy cannot withstand BASF's motion for summary judgment.

B.

Menovcik also asserts a breach of contract claim on the basis of the Company's Severance Policy, alleging that his position was eliminated following the decision to terminate him and that, as a result, he is entitled to severance pay. BASF argues that the Severance Policy is not enforceable because Menovcik's position was not eliminated.

Paragraph 4.1 of BASF's Severance Policy states when and under what circumstances an employee may receive severance pay for involuntary termination:

4.1 Eligibility for Basic Severance Benefits
To be eligible to receive Basic Severance Benefits, an employee must be involuntarily terminated as a result of a Position Elimination.


2.14 Position Elimination
Involuntary termination of employment as a result of
• declining business
• elimination of the employee's position

20

- sale, transfer, or other disposition of a business or a portion of a business
- discontinuance of operations, or
- outsourcing of the employee's job function

(Def.'s Mot. for Summ. J., Ex. 10, ¶¶ 4.1, 2.14.)

The phrase "Position Elimination" is a contractual term that is defined in paragraph 2.14 of the BASF policy. One of the enumerated definitions includes the "involuntary termination of employment as a result of . . . declining business." There is evidence that BASF was in the process of downsizing and cost-cutting exercises within Menovcik's division (and at the Company as a whole) at the time of his termination, and as a result of economic strains. Given this history of cost-cutting, a jury could believe that BASF was attempting to save money by terminating Menovick and then denying him severance pay.

Another articulated definition of "Position Elimination" provided by BASF is an "involuntary termination of employment as a result of . . . elimination of the employee's position." Following Menovcik's departure, his division underwent a large reorganization (presumably, in part, because thirteen of Menovcik's subordinates were laid off shortly after he was terminated). Following the reorganization, Menovcik's job title was never assigned to another employee. Rather, his duties were shifted to Paul Lamberty, who occupies a different position and title within the Company. Some of Menovcik's other duties were also transferred to a different, lower level employee. Given the evidence of Company-wide downsizing and the elimination of Menovcik's job title and dispersal of his duties, the Court finds that there is sufficient circumstantial evidence to preclude the entry of a summary judgment in connection with Menovcik's breach of contract claim pursuant to the Severance policy.

BASF states that Paragraph 4.1.2 of the Severance Policy provides that those employees who are terminated for performance problems or inappropriate conduct are not eligible to receive

severance benefits. However, the question of whether Menovcik was in fact terminated due to performance problems or, as he contends, because the Company interfered with the vesting of his benefits, goes to the heart of this case and is very much in dispute. Thus, the Court holds that entry of a summary judgment on a breach of the Severance Policy is inappropriate.

VI.

Menovcik asserts that the implication of Karr's statement to a group of employees that he had violated the Code of Conduct was false and defamatory. However, BASF contends that truth is an absolute defense to a defamation action and because her statements were literally true (she told the employees the same thing that she told Menovcik regarding his termination), Menovcik's claim fails as a matter of law.

"A communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Ireland v. Edwards*, 584 N.W.2d 632, 636 (Mich. Ct. App. 1998). Under Michigan law, the elements of defamation are "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication." *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005) (citations omitted). The question of whether a statement is capable of carrying a defamatory meaning is one for the court to resolve, *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008)(citation omitted), although "the court does not decide whether a statement was actually defamatory, . . . only whether a reasonable fact-finder could interpret it as containing false assertions of fact." *Ogle v. Hocker*, 279 Fed. Appx. 391, 397 (6th Cir. 2008) (citation omitted).

22

A.

Michigan recognizes a cause of action for defamation by implication. *Hawkins v. Mercy Health Services, Inc.*, 583 N.W.2d 725, 732 (Mich. Ct. App. 1998). However, in order to establish that limited cause of action, a plaintiff can succeed only if he proves (1) "that the defamatory implications are materially false," and (2) "that such a cause of action might succeed even without a direct showing of any actual literally false statements." *Id.* Ultimately, an action for defamation by implication must still conform to the guiding constitutional principles of defamation law, one of which being that a plaintiff bears the burden of proving falsity. *Id.* at 132-33. Michigan law has long recognized that truth is an absolute defense to a defamation claim. *See Butcher v SEM Newspapers, Inc.*, 475 N.W.2d 380, 382 (Mich. Ct. App. 1992).

Here, BASF does not argue that Karr's statements were not capable of being defamatory, relying instead upon the literal truth of her remarks as a complete defense to Menovcik's claim. However, he submits that even if Karr's statement may have been literally true, BASF engaged in defamation by implication – the implication that he actually violated the Code of Conduct. As explained above, the record has given rise to genuine issues of a material fact surrounding Menovcik's termination. He denies any allegations by BASF that suggest his conduct constituted a violation of the Code of Conduct. Additionally, the already discussed evidence of Karr's arguably hasty investigation, BASF's cost-cutting program, and Menovcik's history of excellent performance reviews support his contention that the Company terminated him for a different reason than proffered.

Further, an affidavit from a fellow employee, Thomas Bailey, as well as Menovcik's own assertions, are evidence that it is well known within the BASF corporate community that the Code

of Conduct addresses only the most serious, flagrant, or illegal conduct. Therefore, Karr's challenged comments could have reasonably led to the implication that Menovcik had engaged in some particularly egregious behavior. Inasmuch as there is a genuine issue of a material fact regarding the actual reason for Menovcik's termination, it follows that whether Karr's statement (Menovcik violated the Code of Conduct) was actually true, is also in contention. Thus, there is enough evidence to support a finding of defamation by implication.

B.

In the alternate, BASF contends that Karr's statement was subject to a qualified privilege because it was made in good faith in an attempt to reassure employees who felt abused by Menovcik. "An employer has a qualified privilege to defame an employee by making statements to other employees whose duties interest them in the subject matter." *Patillo v. Equitable Life Assur. Soc. of U.S.*, 502 N.W.2d 696, 699 (Mich. Ct. App. 1992) *(*citation omitted). The five elements of qualified privilege are as follows: "(1) good faith; (2) an interest to be upheld; (3) a statement limited in scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only." *Smith v. Fergan,* 450 N.W.2d 3, 4 (Mich. Ct. App. 1989) (citation omitted). The inquiry into whether a qualified privilege exists in a particular case is one of law to be decided by the court, based on the circumstances surrounding the communication. *Peisner v Detroit Free Press*, 266 N.W.2d 693, 698 (Mich. Ct. App. 1978).

Importantly, an employer's qualified privilege extends only to statements made to those whose duty requires their knowing, which is a limited group. In *Sias v. General Motors Corp.*, 127 N.W.2d 357, 360 (Mich. 1964), the Michigan Supreme Court held that no privilege is extended to a corporate representative who explained to employees that a fellow employee had been released

for misappropriation of company property because the men who were informed were not "supervisors, personnel department representatives, or company officials. They were simply fellow employees in the identical work." *Id.* The court noted that, although the company was interested in restoring morale and quieting rumors, a qualified privilege did not extend to the employees at issue. *Id.* This view was again articulated by the court in *Patillo v. Equitable Life Assur. Soc. Of U.S.*, 502 N.W.2d 696, 699 (Mich. Ct. App. 1992), with that court finding that:

> [F]ellow agents may have had an interest in the corporation's standard of conduct and grounds for termination, but they did not have a duty that would interest them in knowing the reason for plaintiff's termination. In other words, the fellow agents were not supervisors, personnel department representatives, or other company officials. Therefore, the statements made by [the employee] were not made under a qualified privilege.

*Id. See also Tumbarella v. Kroger Co.*, 271 N.W.2d. 284, 289 (Mich. Ct. App. 1978) ( a qualified privilege to defame an employee exists when statements are made to other employees "whose duties interest them in the subject matter, such as . . . hiring and firing").

Here, Karr told Menovcik's fellow employees that he had been discharged for violating the Company's Code of Conduct. While her comments may have been made in good faith, the fact remains that they were made to employees who had no duty (such as hiring or firing responsibilities) that would have interested them in the subject manner, and who were subordinate to Menovcik. This falls squarely within the realm of inappropriate disclosure articulated in *Sias*, *Patillo* and *Tumbarella*.

Regarding the truth of Karr's statements, the pleadings have given rise to a genuine issue of a material fact which must be left to the trier of facts. Further, BASF cannot successfully show that Karr was entitled to a qualified privilege when making her comments to employees. Therefore, the entry of a summary judgment is inappropriate with respect to Menovcik's

defamation claim.

VII.

Menovcik alleges that the circumstances which surround his termination and the "viciousness and hostility" exhibited by Karr during her investigation constituted "outrageous" behavior sufficient to support a claim for intentional infliction of emotional distress. BASF asserts that, as a matter of law, firing someone cannot create the basis for a claim of intentional infliction of emotional distress.

Although the Michigan Supreme Court has not recognized a cause of action for an intentional infliction of emotional distress, the Sixth Circuit has consistently presumed that it will do so. *Ogle* 279 Fed. Appx. at 400 (citing *Andrews v. Prudential Sec., Inc.*, 160 F.3d 304, 309 (6th Cir. 1998)). To establish an intentional infliction of emotional distress claim, a plaintiff must show the existence of "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v. Ford*, 604 N.W.2d 713, 716 (1999) (citing *Haverbush v. Powelson*, 551 N.W.2d 206 (1996)). In order for an intentional infliction of emotional distress claim to stand, the conduct complained of must rise to a level beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" *Id.* The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

"[B]oth state and federal courts in Michigan have repeatedly held as a matter of law that the termination of an individual's employment is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress." *Scuderi v. Monumental Life Ins. Co.*, 344 F.Supp.2d 584, 606 (E.D. Mich. 2004); *c.f., Fulghum v. United Parcel Service, Inc.*, 378 N.W.2d 472 (Mich.

26

1985) (accusing plaintiffs of theft and subsequently discharging them was not sufficiently outrageous behavior to support an intentional infliction of emotional distress claim).

While BASF's actions may have been in some respects unkind, they are insufficient as a matter of law to be considered extreme and outrageous conduct. Additionally, even if Karr's statement to BASF employees that Menovcik had been terminated for violation of the Code of Conduct is found to be defamatory in nature, the words themselves, and the injury sustained (which appears to be, at most, embarrassment) are not sufficiently outrageous enough to support a separate intentional infliction of emotional distress claim. Further, in her deposition, Karr testified that it was common procedure for a security official to accompany employees from the building upon termination and, while Menovcik contends that the guard "roughly" escorted him off the BASF property, there is no evidence that he suffered any physical harm or emotional distress beyond hurt feelings to suggest that the guard's actions were outrageously aggressive. Indeed, all of the injuries that Menovcik claims (embarrassment, loss of reputation, and respect) seem to be based on the termination of his job, which, under Michigan law is not grounds for an intentional infliction of emotional distress claim.

Therefore, the Court finds that, as a matter of law, BASF's conduct fails to reach the extreme and outrageous level required to establish a cause of action for an intentional infliction of emotional distress claim, and grants BASF's motion for summary judgment on this issue.

## VIII.

Accordingly, for the reasons that have been set forth above, the Court grants in part, and denies in part, BASF Corporation's motion for summary judgment.

IT IS SO ORDERED.

Dated: September 8, 2010                    s/Julian Abele Cook, Jr.
      Detroit, Michigan                    JULIAN ABELE COOK, JR.
                                  United States District Court Judge

<u>Certificate of Service</u>

     I hereby certify that on September 8, 2010,  I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                        s/ Kay Doaks
                                        Courtroom Deputy Clerk