UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY MENOVCIK,

        Plaintiff,

v.

                                         Case No. 09-12096

BASF CORP.                           Honorable Julian Abele Cook, Jr.

        Defendant.


ORDER

The Plaintiff, Gregory Menovcik, complains that the Defendant, the BASF Corporation ("BASF"), terminated his employment in violation of existing federal and State of Michigan statutes and State of Michigan common law. After a four-day trial, the jury rejected Menovcik's claims that BASF had (1) discharged him from the employment rolls because of his age in violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101, et seq.; (2) breached a mutually agreed upon contract of employment; and (3) defamed him by mischaracterizing the reasons for its administrative decision to third persons. The jury also rendered an advisory verdict in which it recommended a rejection of Menovcik's claim that BASF had unlawfully terminated him in violation of § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.

The Court now renders its independent findings of fact and conclusions of law regarding Menovcik's ERISA § 510 claim. *See* Fed. R. Civ. P. 52(a) ("In an action tried on the facts . . . with an advisory jury, the court must find the facts specially and state its conclusions of law

1

separately."). To the extent that any findings of fact by the Court may be deemed to be conclusions of law, they are adopted as such. To the extent that any conclusions of law may be deemed to be findings of fact, they are so adopted.

I

A.      <u>Facts Stipulated by the Parties</u>

1.      Menovcik was born on June 15, 1954.

2.      Menovcik began working for Celanese Polymers in 1979. BASF subsequently acquired Celanese Polymers, after which he continued as an employee of BASF.

3.      Menovcik earned a Bachelor of Science degree in chemistry from Wayne State University on June 1, 1982, and a Master of Science degree in chemistry from Wayne State University five years later.

4.      Except for leaves of absence to obtain his degrees in chemistry from Wayne State University, he worked continuously for BASF and/or Celanese Polymers from 1979 through March 13, 2009.

5.      BASF involuntarily terminated his employment on March 13, 2009.

6.      As of March 13, 2009, Menovcik held the position of Technical Manager of the Product Development Group for OEM Coatings with BASF, a position to which he had been promoted in April 2005.

7.      As of March 13, 2009, Menovcik was a grade level 19 employee of BASF where he earned a base annual salary of $143,868.05.

8.      Including his base salary, bonuses and other compensation into his financial picture, Menovcik earned a total of $183,061.06 in compensation from BASF in 2008, which

included a bonus of $39,400.

9.      Bonuses from BASF are not guaranteed.

10.     When BASF involuntarily terminated Menovcik's employment on March 13, 2009, he was

an official participant in BASF's Salaried Employee's Pension Plan ("the Plan").

11.     For purposes of the Plan, Menovcik was credited with an initial service date of March 24,

1981.

12.     On October 11, 1999, Menovcik elected to participate in the Traditional Pension Plan that

had been offered to him as a part of the Plan.

13.     After BASF involuntarily terminated his employment on March 13, 2009, Menovcik elected

to begin receiving monthly pension payments from the Plan on his 55th birthday. Since

making this election, Menovcik has received monthly pension payments of $2,479.30,

which he will continue to receive for the remainder of his life.

14.     If Menovcik had remained an employee of BASF through his 55th birthday (June 15, 2009)

and taken early retirement on that date, he would have been entitled to receive monthly

pension payments from the Plan of $3,890.13 until he reached the age of 62. Thereafter, the

monthly pension payments would have been $3,221.36 for the rest of his life.

15.     Had Menovcik remained employed by BASF through July 1, 2010 (at which point his age

plus years of service with BASF would have equaled 85) and taken early retirement on that

date, he would have received monthly pension payments from the Plan of $5,448.61 until

he turned 62. Thereafter, the monthly pension payments would have been $4,774.20 for the

remainder of his life.

16.     After BASF terminated Menovcik's employment, BASF conducted a meeting on March 13,

3

2009 to which some of his colleagues and subordinates were invited. During this meeting, BASF and/or its representatives advised Menovcik's colleagues and subordinates that his employment had been terminated for a violation of BASF's Code of Conduct.

17.     On January 1, 2008, the number of employees in BASF's OEM Coatings division in the United States was 467. On October 30, 2009, the number of employees in BASF's OEM Coatings division in the United States had been reduced to 348.

18.     As of March 13, 2009, Menovcik's life expectancy was 25.7 years.

19.     As of December 7, 2010, Menovcik's life expectancy was 24.9 years.

20.     If Menovcik had been terminated due to the elimination of his position, he would have been entitled to 44 weeks of severance but only after signing a release of BASF.

B.      <u>Additional Findings of Fact by the Court</u>:

1.      At or about the time when Menovcik was terminated from his employment, BASF was undergoing a comprehensive cost-cutting program.

2.      As part of this cost-cutting program, some work was shipped overseas and to other locations in the United States.

3.      A planned reduction in staff personnel was also implemented by BASF, in that approximately twenty-five employees were terminated from Menovcik's department within a few days following his termination.

4.      Menovcik consistently received promotions, pay raises, and strong performance reviews throughout his employment at BASF.

5.      Prior to March 2009, (a) he had never been told of any employee-generated complaints regarding his management style, and (b) his most recent performance review indicated that

4

he had done a "great job mentoring and coaching" and "helped team dynamics."

6.  At the time of his termination, Menovcik directly supervised seven employees who, in turn, oversaw approximately thirty other employees.

7.  In early March, Kristy Karr, the Director of the Human Resources Department for the OEM division at several BASF sites, received a telephone call from Michael Pcolinski, a director of another BASF division. He informed her that he had been contacted by a BASF employee who (a) complained about the treatment by Menovcik of those persons under his supervision, and (b) had filed or intended to file a complaint on the confidential BASF "complaint hotline." Karr subsequently learned that the complainant was Patrick Mormile.

8.  On March 9, 2009, Karr discussed Pcolinski's call with Menovcik's direct supervisor, Kenneth Perry. It was their collective agreement that they should give a serious look into these allegations.

9.  Thereafter, Karr and Perry met with their boss, Juan Carlos Ordonez, who was advised by them that they would conduct an investigation into the merits, if any, of the complaint.

10. On the morning of March 10, 2009, Karr and Perry met with Menovcik, who was told by them of their intention to investigate the charges that had been made against him by an unidentified employee.

11. They resisted Menovcik's request that they disclose the identity of the complainant or the specific details of the accusations.

12. In making his request for disclosure, Menovcik denied having maltreated any employee, including the unidentified complainant.

13. During the period between March 10th and March 13th of 2009, Karr and Perry

5

interviewed five of Menovcik's direct subordinates; namely, Donald Campbell, Timothy December, Hans Fuchs, Paul Harris, and Patrick Mormile.

14. Neither Perry - Menovcik's direct supervisor - nor any of the approximately thirty individuals who reported to Menovcik's direct subordinates were interviewed as part of the investigation.

15. On March 10, 2009, a complainant - subsequently identified as Patrick Mormile - filed a complaint on the confidential BASF "complaint hotline," contending that Menovcik (a) had threatened the jobs of some of his subordinates, (b) was vindictive and devious, and (c) attempted to pit employees against one another.

16. The complaint also stated - incorrectly, it turned out - that another individual had filed a complaint about Menovcik with the human resources department four days earlier. The complaint further stated that, the following day, Menovcik called his supervisor at home, asked to be told the identity of that individual, and threatened to bring the "wrath of God" down upon the person who had filed a complaint about him with human resources.

17. Mormile testified - via a taped de benne esse deposition - that the complaint inaccurately recorded his statements to the hotline. Specifically, he stated that Menovcik had believed that somebody had filed a complaint with human resources, and that he had called Harris - one of his direct reports, not his supervisor - to learn the identity of who had done so.

18. Harris testified that Menovcik had, in fact, called him at home, sought to determine if anyone within their group had filed a complaint about him with the human resources department, and asserted that he would make certain that anyone who did so would lose their job or be demoted.

19.   On March 11th, Karr, after receiving and reviewing a copy of the hotline complaint, met with Ordonez once again to update him on the process of the investigation. According to Karr, she was instructed by Ordonez to "do what you think is right." This comment was construed by Karr to mean that she was authorized to terminate Menovcik's employment if that, in her opinion, would be an appropriate employment measure.

20.   The Karr-Perry investigation revealed the following information that is summarized below:

Donald Carpenter, who appeared to be extremely apprehensive to be talking about this situation, was told by Menovcik that, if he registered a complaint about him with the human resources department, a loss of his employment with BASF would surely follow. According to Carpenter, Menovcik would frequently yell about minor things, treat his subordinates in a demeaning manner, and refuse to give any consideration to their ideas. He also asserted that Menovcik had warned him not to talk with any employees outside of his own department because, in his opinion, all of them were incompetent.

Timothy December, who also appeared to be quite nervous when discussing Menovcik's job performance with Karr and Perry, inquired whether he would be fired for talking with them. His description of Menovcik's conduct mirrored the comments by Carpenter. He also noted that Menovcik had threatened to fire him if he ever questioned his judgment in front of other persons.

Hans Fuchs reported that he had no problems with Menovcik and had never experienced any bullying or threatening behavior from him.

Patrick Mormile reported feeling concerned for his colleagues based on the stories

7

that he had heard from other persons. However, noting that, inasmuch as he was now reporting directly to Menovcik, Mormile had begun to receive this same insensitive treatment from him.

Paul Harris appeared the most nervous all of the employees who were interviewed, in that he was shaking and appeared to be near tears. Like December, he was concerned that he was about to be fired because Menovcik had threatened his job status if he contacted anyone from the human resources department.

21. Aside from Fuchs, who did not testify during the trial, these investigative findings were supported by the employees' testimony, all of which the Court finds to be credible.

22. On March 13, after Karr and Perry completed their fifth and last interview of Menovcik's direct reports, they made a determination to terminate Menovcik's employment with BASF. In making this decision, Karr and Perry considered the apparent disparity between Menovcik's extremely high performance reviews (including in the area of management) and the information received by them during the investigation.

23. They concluded that the fact that problems with Menovcik's management style were not reflected in his employment reviews was consistent with the interviewees' statements that they were fearful of making any detrimental reports to the human resources department regarding his conduct.

24. Karr and Perry considered the interviewees' statements to be credible because, among other things, (a) they were able to provide specific examples of Menovcik's conduct, (b) their general descriptions relating to his management style were consistent with each other, and (c) they were not seeking anything in return.

8

25.     After reaching a consensus regarding Menovcik's employment tenure, they met with him in the presence of BASF security personnel and advised him that they had completed their investigation and that his employment with BASF was terminated, effective immediately.

26.     Menovcik was thereafter escorted from the premises by Karr and BASF security personnel.

27.     There is no evidence that Menovcik was specifically advised that he was being terminated for violating the BASF Code of Conduct.

28.     BASF typically adopts a progressive discipline policy for those employees who do not perform up to their capabilities. The usual steps are as follows: (a) the employee's supervisor will discuss the concerns with the employee; (b) a second verbal warning is given if the employee does not satisfy the required improvements; (c) the supervisor, along with a representative from the Human Resources Department, meet with the employee and document the area of concern and lack of improvement; and (d) the employee is placed on a ninety-day Performance Improvement Plan ("PIP").

29.     Menovcik was not placed on a PIP and the placement of him on such a plan was never considered by BASF.

30.     If Menovcik had been placed on a PIP between early and mid March of 2009, he would have been within days of his fifty-fifth birthday upon the expiration of the PIP.

31.     Karr testified that neither she nor Perry considered Menovcik to be a viable candidate for placement on a PIP because the matter under investigation was neither a performance issue nor a one-time problem.  Rather, their investigation of Menovcik related to a pattern of conduct in violation of the values of BASF.

32.     The BASF Code of Conduct contains an appendix that contains a list of values to which the

company is committed, including "Mutual Respect and Open Dialogue." (Def.'s Ex. B).

33. The BASF "Leadership Compass" states that "[c]ontinuous dialog between employees and managers is crucial for a good working climate," and one of its "Core Messages: is that "[e]very manager should act as a role model." (Def.'s Ex. P).

34. The investigation performed by Karr and Perry - though deficient in several ways - provided sufficient information for them to make an informed decision with respect to Menovcik's employment with BASF. These deficiencies include:

    a.    Some of the individuals who were interviewed had prior conflicts with Menovcik which were related to, for example, (i) the poor performance reviews that they had received from him and (ii) their relative rates of advancement within the company. Karr testified that she and Perry considered the possibility that these conflicts may have been sources of bias, but they nevertheless found the statements of these interviewees to have been credible.

    b.    Perry, who was Menovcik's direct supervisor, was not interviewed even though he worked in close proximity to, and had daily contact with, him.

    c.    Although Menovcik was given an opportunity to tell his side of the story, his ability to respond effectively was severely undermined because he was never informed of the specific allegations that had been made against him.

    d.    The decision to terminate Menovcik was not reviewed and formally approved in the manner as outlined in the BASF involuntary termination policy.

35. Shortly after Menovcik was escorted from the BASF premises, he called Karr and stated that (a) he was sorry and had never meant to hurt anyone, (b) the job was very important to him,

and (c) he liked working for BASF.

36.     Menovcik also asked if BASF could "bridge" him to his retirement. "Bridging" is a process whereby employees may receive benefits as if they had reached a particular benefits milestone if their position had been eliminated less than one year prior to reaching that milestone. His request was denied.

37.     The two factors that, when combined, would have entitled Menovcik to a larger pension are his age and his years of service.

38.     Menovcik was never told that he was terminated because of his age or pension benefits.

39.     The three individuals involved in the decision to terminate him (Karr, Perry, and Ordonez) affirmatively testified that they never considered Menovcik's age or pension benefits in making the decision to terminate him.

40.     The copy of the hotline complaint contained handwritten notes that set forth his employee grade level ("19"), age ("54") and years of service ("27 yrs"), with an arrow connecting the latter two figures.

41.     The only individuals who handled this document (i.e., the "hotline complaint") were upper-level management personnel who were involved in the investigation.

42.     Menovcik did not rebut the trial testimony of Karr, who stated that she had written the numbers (see paragraph 40) on the document *after* he had been terminated, and in response to his request to be "bridged" to retirement. According to Karr, these figures were only inscribed so that she would have these figures available to her when she relayed Menovcik's request to the benefits director.

43.     Ordonez testified that, relative to the size of the entire pension plan, any cost savings that

would be realized by removing one beneficiary was insignificant.

44.     The jury was instructed that, if it found that the termination of Menovcik's employment was motivated at least in part by BASF's awareness that his pension benefits were about to vest because of his age, it may consider this fact as evidence of age discrimination.

45.     The jury returned the following findings:

   a.     Menovcik's age was not one of the motives or reasons which made a difference in BASF's decision to discharge him.

   b.     When BASF advised his colleagues and subordinates that his employment had been terminated for his violation of BASF's Code of Conduct, the statement was not false in any material respect.

   c.     Menovcik was not involuntarily terminated as a result of the elimination of his job position.

46.     The jury also rendered the following advisory finding:

   a.     Interference with Menovcik's attainment of the rights to which he would have been entitled under the Plan was not a motivating factor in BASF's decision to terminate his employment.

II.

A.     <u>The Role of an Advisory Jury</u>

There is no right to a jury trial with respect to Menovcik's ERISA § 510 claim. *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 883 (6th Cir. 1997). However, acting on the basis of Federal Rule of Civil Procedure 39(c)(1), the Court elected to submit this claim to the jury sitting in an advisory capacity. A court may not simply adopt the advisory jury's findings and conclusions as its

12

own, but instead it must make its own, independent determinations. Fed. R. Civ. P. 52(a); *see also Morelock v. NCR Corp.*, 546 F.2d 682, 689 (6th Cir. 1976), *superseded by statute on other grounds* ("When an advisory jury is used, the ultimate responsibility for findings of fact and conclusions of law remains with the district court."). However, the Court may not make a finding of fact with respect to the equitable ERISA claim that conflicts with a finding of fact made by the jury with respect to the remaining legal claims. *Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928 (11th Cir. 1983) ("When a party has the right to a jury trial on an issue involved in a legal claim, the judge is . . . bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim."); *Wade v. Orange Cnty. Sheriff's Office*, 844 F.2d 951 (2d Cir. 1988) ("[W]hen the jury has decided a factual issue, its determination has the effect of precluding the court from deciding the same fact issue in a different way."); *Dasler v. E.F. Hutton & Co., Inc.*, 694 F. Supp. 624, 627 (D. Minn. 1988) ("[T]o the extent that legal and equitable issues overlap, the jury's verdict on the legal claim operates as a finding of fact binding on the [c]ourt in its disposition of the accompanying equitable claim.").

B.     Legal Framework

Section 510 of ERISA, 29 U.S.C. § 1140, in relevant part, makes it unlawful for an employer to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." This provision is "aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980).

In order to state of claim under § 510, a plaintiff must demonstrate - through direct or

13

circumstantial evidence - that the employer had a specific intent to violate ERISA. *Schweitzer v. Teamster Local 100*, 413 F.3d 533 (6th Cir. 2005) (citing *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997)). However, a plaintiff "need not show that the employer's sole purpose in discharging [him] was to interfere with [his] entitlement to benefits but rather only that it was 'a motivating factor' in the decision." *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir. 1992) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992)).

Direct evidence is that which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 537 (quoting *Jacklyn v. Schering-Plough Heathcare Prods., Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)); *see also Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice . . . ."). Here, there is no direct evidence that BASF acted with the specific intent of violating ERISA § 510.

In the absence of direct evidence of a discriminatory intent, a plaintiff can state a prima facie case by "showing the existence of (1) prohibited employer conduct (2) [that was]  taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Ameritech*, 129 F.3d at 865 (citations and internal quotation marks omitted). Moreover, the plaintiff must show "a causal link between pension benefits and the adverse employment decision." *Id.* (citations and internal quotation marks omitted). Thus, the "plaintiff must come forward with evidence from which a reasonable jury could find that the defendants' desire to avoid pension liability was a determining factor in [the] plaintiff's discharge." *Id.*

Following the burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

14

(1973), an employer can refute an employee's prima facie ERISA claim by advancing "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Humphries*, 966 F.2d at 1043 (citation and internal quotation marks omitted). The burden then shifts back to the plaintiff to demonstrate that the proffered reason is a pretext which was put forth to conceal an impermissible reason for the termination. *Ameritech*, 129 F.3d at 865.

Menovcik argues that the evidence supports a finding that BASF's decision to terminate his employment was motivated at least in part by an intent to interfere with his attainment of the higher benefits to which he would have been entitled if he had remained employed by BASH until he reached the age of fifty-five. He submits that BASF's proffered explanation - that its investigation revealed that Menovcik's conduct toward his subordinates was in violation of BASF policies and values - cannot withstand scrutiny. Rather, he insists that the proffered explanation was merely a pretext for its true motivation.

BASF counters that Menovcik failed to make out his ERISA claim because he did not present any evidence that (1) it terminated his employment with the specific intent of causing an interference with his attainment of benefits, and (2) there existed a causal link between his pension benefits and the adverse employment decision. Moreover, BASF argues that, even if Menovcik had made out a prima facie case, he still would not be entitled to a verdict in his favor because there has not been any rebuttal by him to its legitimate, nondiscriminatory reason for the now-challenged decision.

C.   Prima Facie Case

Menovcik arguably can establish the three elements of his prima facie case simply by pointing to the proximity in time between his termination and the date on which he would have

15

attained a substantial increase in ERISA benefits. *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043-44 (6th Cir. 1992) (plaintiff's evidence that he was discharged within two months of when his pension would have vested, thereby saving the employer substantial sums of money, "[a]lthough . . . no more than the bare minimum that a plaintiff must show to meet the prima facie case threshold, in this case . . . satisfies that low threshold because, examining only [plaintiff's] evidence, the proximity to vesting provides at least some inference of intentional, prohibited activity"); *see also Petrus v. Lucent Techs., Inc.*, 102 F. App'x 969, 971 (6th Cir. 2004) (citing *Humphreys* for proposition that Sixth Circuit has "sometimes allowed a plaintiff to make out a prima facie case of ERISA discrimination by showing a close temporal proximity between the employer's action and an important milestone in the vesting of the employee's pension benefits"); *Pennington v. W. Atlas, Inc.*, 202 F.3d 902, 908 (6th Cir. 2000) (citing *Humphreys* with approval); *but see Wright v. Sears, Roebuck & Co.*, 81 F. App'x. 37, 45 (6th Cir. 2003) (unpublished) ("Proximity to vesting and a showing of cost savings is not sufficient, standing alone, to entitle plaintiff to a trial."). Under these cases, Menovcik has established his prima facie case simply by establishing that he was involuntarily terminated within three months of the date when he would have attained a substantial increase in his benefits.

Although not technically a part of the prima facie case, Menovcik must also show a causal link between the adverse employment decision and his benefits. *See Ameritech*, 129 F.3d at 865; *Pennington*, 202 F.3d at 907-08 (noting that plaintiffs established prima facie case by pointing to their proximity of vesting and the employer's associated cost savings, but were still required to show the requisite causal link to survive summary judgment). Menovcik argues that the requisite causal link is supplied by the context in which his termination took place. Specifically, he submits that,

16

against the backdrop of BASF's cost-cutting program, the hasty and procedurally improper manner in which he - an employee with a long and distinguished record with BASF - was terminated can only be explained by the desire of his employer to prevent him from attaining increased benefits.

However, BASF has presented evidence which significantly undercuts his argument. First, as will be discussed *infra*, several employees of BASF gave consistent and credible testimony which explain the manner and the outcome of the investigation. Second, Ordonez testified that any cost savings resulting from removing one individual entirely from the pension plan would not be significant in relation to the overall BASF pension plan.[1] Moreover, the difference between the benefits that Menovcik is receiving and would have received upon retiring from BASF at the age of fifty-five - a difference of approximately $280,000 over Menovcik's anticipated life expectancy - is, of necessity, an even smaller figure. The fact that his termination will not result in any significant cost savings to BASF severely undermines Menovcik's claim that he was discharged by BASF in an effort to avoid paying higher pension benefits to him.

Thus, the Court concludes that Menovcik has failed to establish a causal link between his pension benefits and BASF's decision to terminate his employment. Therefore, he has not successfully established that an interference with his pension benefits was a motivating factor in his termination. This finding is consistent with (1) the advisory jury's non-binding conclusion that an interference with his attainment of his pension rights was not a motivating factor in BASF's decision to terminate his employment, and (2) the jury's finding, which is binding upon this Court, that BASF

---

[1]Ordonez also testified that BASF did not need to make any contributions to the pension fund in 2007, 2008, and 2009 because it was over-funded.

did not discriminate against Menovcik on the basis of his age.[2] Moreover, as will be discussed *infra*, even if Menovcik had made out his claim, he has failed to rebut BASF's proffered explanation for its decision.

D.     Pretext

BASF argues that it had a legitimate, nondiscriminatory reason for terminating Menovcik's employment upon hearing that he had a history of bullying his direct reports in violation of its values which were expressed in its Code of Conduct and Leadership Compass. The evidence that was produced during the trial plainly shows that BASF has articulated a legitimate, nondiscriminatory reason for its administrative decision to terminate him. *See Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (stating, in age and gender discrimination case, that "the defendant need not *prove* a nondiscriminatory reason for not promoting [plaintiff], but need merely *articulate* a valid rationale").

The burden of establishing that BASF's proffered explanation was pretextual is now in the hands of the Menovcik.  Under the circumstances of this case, he must "show by a preponderance of the evidence . . . (1) that the [employer's] proffered reasons had no basis in fact, (2) that [these] proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Pennington*, 202 F.3d at 909 (importing this test from context of ADEA to context of ERISA).

"The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false." *Id.* Menovcik

---

[2]The jury was instructed that, if it found that the "termination of . . . Menovcik's employment was motivated at least in part by the fact that his pension benefits were about to vest as a result of his age, [it] may consider this as evidence of age discrimination."

has not contended that the proffered reasons were without any basis whatsoever. In fact, he acknowledged during his testimony that he was not suggesting that his direct reports had lied to Karr and Perry during their investigation. Rather, he opines that these individuals and he simply must have had different impressions of their interactions. There is also no evidence or an allegation by Menovcik that BASF controlled the timing or invented or purposefully misconstrued the substance of either the initial report of a complaint or the interviews so as to generate an excuse to terminate him. *See Shahid*, 76 F.3d at 1414 (finding no pretext where employer had received notice that employee had accepted kickbacks from outside supplier, and noting "[t]he date of [the suppliers' notice] letter and the attached documentation show that [the employer] did not invent this violation or control the timing of its surfacing from a source outside the company").

Menovcik has also failed to present any evidence that BASF's proffered reason was insufficient to justify his termination. "The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Pennington*, 202 F.3d at 909. Menovcik has made no such allegation.

However, Menovcik does point to certain irregularities in the investigative process which, in his opinion, demonstrate that the investigation was not undertaken to determine if he had violated the Code of Conduct. Rather, he argues that the investigation was, in fact, a "smokescreen" for the true reason for his termination - to wit, to avoid having to provide him with the additional monies that would have to be paid in benefits. With respect to this type of claim, the plaintiff does not dispute the factual basis of the proffered explanation or that those facts could justify the decision.

19

Rather, it represents his "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or a coverup." *Pennington*, 202 F.3d at 909.

When Karr was notified that a complaint had been or was about to be filed against Menovcik, she - along with Perry - initiated an investigation. Of the five direct reports whom they interviewed, four of them presented consistent stories of having been berated, demeaned, and threatened by Menovcik. Three appeared visibly nervous and/or upset about simply discussing the situation. Karr's trial testimony was corroborated by the testimony given by these individuals.

The Court notes - but ultimately rejects - Menovcik's assertion that Karr and Perry improperly relied on their subjective assessments of the interviewees' mental and emotional states in reaching their decision.[3] Menovcik cites *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1298 (D.C. Cir. 1988), for the proposition that an "employer's heavy use of 'highly subjective' criteria can support an inference of discrimination." (Pl.'s Post-Trial Br. at 15). In *Aka*, an employer claimed that it decided not to hire the plaintiff because the candidate who was eventually selected was (1) better qualified and (2) more enthusiastic about the position. However, the court determined that a reasonable jury could find that the plaintiff was "markedly better qualified" than the successful applicant, leaving only the employer's second, subjective basis to explain the decision. *Id.*

---

[3]The Court will assume, for the sake of Menovcik's argument, that Karr and Perry's assessment of the interviewees' emotional and mental states is a wholly subjective factor, notwithstanding that their actual observations of the physical, outward manifestations of that state are clearly objective.

20

"Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination." *Id.* Thus, courts are advised to be skeptical of wholly subjective bases where the proffered objective basis is not credible and, in fact, points to an opposite conclusion than does the subjective basis.

Here, unlike in *Aka*, the purportedly subjective basis comports with other, objective bases for the decision. The statements given by the interviewees *and* the outward manifestations of their mental and emotional states both lead to the same conclusion; namely, that BASF did not rely solely or heavily upon subjective factors with which to overcome the conflicting objective evidence in Menovcik's performance reviews. Instead, it relied on consistent objective and subjective evidence to overcome other, conflicting objective evidence. *Aka* acknowledges this distinction: "An employer's reliance on disputed subjective assessments will not create a jury issue in every employment discrimination case. For example, if this reliance is modest, and the employer has other, well-founded reasons for the employment decision, summary judgment for the defendant may be appropriate." *Id.*

This case would more closely resemble *Aka* if BASF had attempted to explain its decision to terminate Menovcik by stating, for example, that (1) his previous performance reviews had contained references that he was a bully, and (2) the subjective assessments of the interviewees' mental states corroborate those references. The first claim, as the evidence demonstrates, would readily be shown to be false, thus raising some  suspicion about BASF's reliance on conflicting subjective evidence. However, of course, BASF made no such claim. Moreover, as noted above, Karr satisfactorily explained why she and Perry considered the interviewees to be credible despite

the existence of seemingly conflicting evidence.

Menovcik points to several procedural flaws in the investigation as well as, more generally, the rapidity with which it was completed in an attempt to prove that it was not a true investigation. The Court has previously noted that the investigation was not as thorough as it could - and arguably should - have been. However, the Court also credits Karr's testimony regarding what she learned during the investigation, finding it to be credible in and of itself but especially so in light of the fact that her testimony was corroborated by Harris, Mormile, Campbell, and December. Having heard four employees' remarkably consistent stories regarding Menovcik's treatment of his subordinates, Karr and Perry determined that an immediate termination was the appropriate response. *See Shahid*, 76 F.3d at 1413 ("[Plaintiff] insists that, in light of her excellent performance ratings, she should not have been summarily dismissed; however, [she] offers no evidence to show that she was entitled to progressive discipline for the type of misconduct that resulted in her discharge."). Even if steps short of termination could have been taken, the Court will not second-guess BASF's determination that the conduct which was attributed to Menovcik was sufficiently severe, detrimental to the company, and contrary to its stated values that termination was the proper outcome. *See Hartsel*, 87 F.3d at 801 ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons."); *Connors v. SpectraSite Commc'ns, Inc.*, 465 F. Supp. 2d 834, 861 (S.D. Ohio 2006) (applying this language from *Hartsel* in ERISA § 510 context).

Thus, Menovcik has not carried his burden of demonstrating that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that [BASF's] explanation is a pretext, or a coverup." *Pennington*, 202 F.3d at 909. Because he has not rebutted his employer's

legitimate, nondiscriminatory reason for terminating his employment, the Court enters a judgment

in favor of BASF in connection with Menovcik's ERISA § 510 claim.


IT IS SO ORDERED.


Dated:  October 18, 2011               S/Julian Abele Cook, Jr.
        Detroit, Michigan              JULIAN ABELE COOK, JR.
                                       United States District Court Judge


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on October 18, 2011.


                                       s/ Kay Doaks
                                       Case Manager